# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

PAULA APPLETON,                )
a/k/a PAULA SWEET,             )
                               )
Plaintiff,                     )
                               )                CIVIL ACTION
        v.                     )                NO.  21-40081-MRG
                               )
NATIONAL UNION FIRE            )
INSURANCE COMPANY              )
OF PITTSBURG, PA               )
AND AIG CLAIMS, INC.,          )
                               )
Defendants.                    )
_____ )

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### September 30, 2024

**GUZMAN, D.J.**

Plaintiff Paula Appleton ("Plaintiff") brought this action against her insurer and claims adjuster, National Union Fire Insurance Company and AIG Claims, Inc. ("AIG Defendants" or "Defendants") seeking damages for alleged violations of G.L. c. 93A and 176D in the handling of her underlying personal injury action. Defendants now move for summary judgment in their favor on all counts. The purpose of the c. 93A and 176D statutory scheme is to "encourage the settlement of insurance claims ... and discourage insurers from forcing claimants into unnecessary litigation to obtain relief." Clegg v. Butler, 424 Mass. 413, 419 (1997) (internal citation omitted). The detailed recitation of the history of this case presents the actions defying this purpose on the part of the insurer. Further, for the reasons stated below, Defendants' motion for summary judgment is **granted**.

I.    Factual and Procedural Background[1]

On January 29, 2015, plaintiff, Paula Appleton (then Paula Sweet), was riding as a passenger with her husband (then fiancée) in her husband's motor vehicle. Ahead of them on the roadway was a tractor-trailer that was stopped in traffic. As Mr. Appleton slowed down and prepared to stop, a pickup truck operated by Thomas Breault struck the Appleton's vehicle from behind. At the time of the accident, Mr. Breault was acting within the scope of his employment with Curtiss-Wright Corporation. Both Plaintiff and Mr. Appleton sustained severe injuries in the accident.

Plaintiff was brought to UMASS Memorial Medical Center where she was diagnosed with a small subarachnoid hemorrhage with concussion, pelvic fracture, right hip fracture, comminuted left sacral fracture into the SI joint, right twelfth rib fracture, left tibial plateau, fibula neck fractures, grade two splenic laceration, and a ruptured bladder. She remained in the hospital for three weeks and was then transferred to a rehabilitation facility. Plaintiff continued treatment in two inpatient rehabilitation facilities through June of 2015, when she was discharged home.

At the time of the accident, Curtiss-Wright Corporation maintained a policy of commercial automobile insurance with a Travelers company that afforded liability insurance with a limit of $1 million. In addition, Curtiss-Wright Corporation had a policy of commercial umbrella insurance with National Union that afforded liability insurance with a limit of $25 million. Thomas Breault had a personal automobile insurance policy with Safety Insurance Company with a $100,000 per person limit. Jason Appleton had a personal automobile insurance policy with Commerce Insurance with a $50,000 per person limit.

---

[1] The following facts are either not in dispute or are stated in the light most favorable to the Plaintiff. The Court draws the facts from the parties' Rule 56.1 statement of material facts, Defendant's Statement of Facts Together with Plaintiff's Responses, [ECF No. 43], and documents referenced therein.

National Union began the claims notes of the accident and ensuing bodily injury claims of Sweet and Appleton on December 1, 2015. AIG Claims administered the claims for National Union.  When the claim came in, it was assigned to Kris Daye. The first AIG electronic claims note, dated December 1, 2015, reflects the initial response to the claim:

> 1) Details of the Loss (How, When, Where, Why)? 2) Involvement of the Insured? Own? Lease? 3)Police Report? Summons Issued? Inspections? Drugs or Alcohol Involved? "Driving Hours" an Issue? 4) Nature and Extent of the Injuries? If Deceased, Personal History. 5) Scope of Employment an Issue? 6) Indemnification Agreement? Tender Offers? 7) Other Parties Involved? Coverages? Negligent? 8) Venue? Trial/Mediation Date? 9) Status of the U/L Investigation? Carrier? File Number? Attachment Point? Demands? Offers?

On December 22, 2015, the claim was first assigned to Charles Weber then assigned to Nicole Washor, the Complex Director at AIG Claims. Subsequently, Ms. Washor coordinated with Thomas Aman of Travelers, who handled the claims under the primary policy. Mr. Weber instructed Ms. Washor to complete a number of investigatory tasks, which included obtaining reconstruction opinions, investigating damages claims, ensuring that appropriate experts were retained and preparing a major loss report.

AIG Claims maintained a set of electronic file notes wherein the file handlers documented certain, but not all, developments with the claims and AIG Claims also maintained a two-page document entitled "Claim Handling Standards." Attorneys Walter Costello and Janet Dutcher of the law firm Kazarosian Costello LLP represented Jason Appleton. Attorneys Katherine Bagdis and James O'Brien from the law firm Mountain, Dearborn & Whiting represented the Plaintiff.

On March 25, 2016, Atty. Badgis wrote to Medicare regarding a settlement reached with Commerce, Mr. Appleton's insurer for $50,000. Ms. Washor wrote to Atty. Bagdis on June 10, 2016, and informed her that [i]n order to proceed with a resolution of this case, both Travelers and AIG need a complete demand package for each claimant. The demand package should summarize all the medical records, medical treatment, pain and suffering, prior injuries, explanation of prior

disabilities, future medicals, lien information, liability arguments and a demand to settle the case. Travelers and AIG would then determine if they had all necessary information and if IMEs of the claimants are needed, and then we can further discuss resolution.

According to Atty. Bagdis, Plaintiff was at the point that, "we were settling with Travelers, we had no idea the full extent of our client's damages. I believe at that time my client may have still been in the rehab facilities. Hadn't even come home yet. We hadn't had her seen by any experts." Atty. Bagdis testified that "there was no way we were at that point able to discuss the full extent of what the damages would be" and that "[w]e hadn't had her seen by any experts."

On June 30, 2016, Ms. Washor spoke with Plaintiffs' counsel, who advised they wanted to settle claim pre-suit. Ms. Washor noted that primary insurer, "Travelers," is prepared to tender money to AIG. Washor and advised claimants' counsel to prepare a settlement demand and that she would evaluate the claims.

Atty. Bagdis sent a demand package to Ms. Washor on August 17, 2016. In the time leading up to the demand package, Plaintiff's attorneys had secured a narrative report form her primary care physician, Dr. Ronald Goldberg, as well as a life care plan from William Burke, Ph.D., and present value analysis from an economist, Dana C. Hewins, Ph.D. In addition, Plaintiff's attorneys hired a videographer to produce a "day in the life" video depicting Plaintiff's injured state. Plaintiff's counsel participated in the production of the video.

In this demand letter, plaintiff's prior counsel wrote, amongst other things,

•       It is anticipated Ms. Sweet will continue to treat for her current symptoms and will address new symptoms as they continue to develop as a result of the injuries she sustained from the collision.

•       Ms. Sweet has not completed her treatment and it appears as though she is not likely to complete treatment in the foreseeable future. Ms. Sweet currently has medical liens with MassHealth and Medicare in excess of $600,000.00 as of May of 2016. The current

liens do not include Ms. Sweet's recent hospitalizations, surgeries, physical therapy, mental health therapy or injections for pain managements.

- Prior to the collision, Ms. Sweet was diagnosed and was being treated for post-traumatic stress disorder (PTSD), related to trauma experienced during her childhood. As a result of her PTSD diagnosis, Ms. Sweet has struggled with depression and suffered from anxiety.

- Ms. Sweet and Mr. Appleton have not had sexual intercourse since the collision. Ms. Sweet likely will never be able to have sexual intercourse again.

- As a result of Ms. Sweet's injuries, she is unable to have children. As Ms. Sweet states in the video, she is unable to describe what she felt when her doctor told her that she could never have another child and if she were to miraculously conceive she would have to have an abortion. It is painfully evident to Ms. Sweet that the life she and Mr. Appleton had planned for will never occur. It is beyond difficult for Ms. Sweet to think about how she will never be able to have children with her husband.

The letter concluded with a "formal settlement demand" in the amount of $18,000.000.00. This demand was based on (1) current medicals in the amount of $600,000.00, (2) future medicals in the amount of $3,720,314.00, and (3) pain and suffering in the amount of $13,000,000.00. Plaintiff's demand and demand package include no amounts or supports for any claim of lost wages and or lost future earning capacity. In response to Plaintiff's Demand, Defendants' first offer was $750 thousand dollars, and their final offer was $2 million dollars.

Following receipt of the demand letter, Ms. Washor conferred with her supervisor, Charles Weber, and proceeded to retain defense counsel to assist with the evaluation and assessment of the claims presented. AIG Claims hired Attorney James Campbell from the law firm Campbell, Campbell, Edwards & Conroy.  Attorney Jacob Lantry worked on the matter along with Attorney Jim Campbell.  On October 13, 2016, defense counsel prepared a summary of Plaintiff's demand package and memorialized their impressions in a memorandum sent to Washor at AIG Claims.

On October 15, 2016, attorney Jacob Lantry wrote to Ms. Washor:

Contrary to our initial discussions, the case may involve significant comparative negligence and injury causation issues. Initial reports of the accident state that the claimants' vehicle struck the stopped tractor trailer first. Some of the injuries sustained by the claimants suggest a significant frontal impact. For instance, Ms. Sweet sustained an "open book" pelvic fracture. My understanding is that injury is sustained in frontal collisions.

If our client struck the claimants' vehicle first, I would expect the seatbacks in the vehicle to be substantially deflected rearward. Although the photographs of the vehicle are not clear, I do not see any such evidence of front seat back deflection.

In any case, I strongly recommend that we retain an accident reconstruction expert and a biomechanical expert to consider the damage to the vehicles and the injuries to the claimants in an effort to determine the accident sequence. if you would like to proceed with that analysis, I will have some recommendations for experts for your consideration.

We should consider the potential liability of the stop tractor trailer in front of the claimants' vehicle. At this point, we do not know how abruptly the tractor trailer stopped or whether the safety equipment such as stoplights worked properly.

Even if all of the injuries are related to the rear collision, the alleged damages and demands seem to be substantially exaggerated. For instance, Ms. Sweet claims that she spends 95% of her time in bed. Based upon the injuries, I do not understand why that would be the case. Mr. Appleton's injuries are less severe and do not support the large settlement demand.

In order to evaluate the damages, I suggest that we retain damage experts including medical doctors, a vocational rehabilitation expert, and a life care planner.

Consistent with my past experience with Walter Costello, Mr. Appleton's lawyer, he has called me incessantly since I was assigned the case. He has asked me multiple times about the proposed mediation before the end of the year. I have responded that my understanding is that we would like to mediate the case, but I am still in the process of evaluating the materials. If you authorize a further investigation of the liability and damage facts and issues, we would have to start the process immediately in order to schedule a meaningful mediation by the end of the year.

[Ex. 14].

On November 26, 2016, defense counsel wrote Ms. Washor:

Nicole, we sent the liability experts materials for preliminary review on Wednesday, November 23. I would expect to have a preliminary discussion with

them in the next two weeks. We need to determine if the plaintiff's injuries were sustained as the result of an initial front-end collision. If that is the case, we will have substantial arguments that the rear end hit by Mr. Breault's vehicle did not cause any additional injuries and damages. Without expert analysis from the accident reconstructionist and the biomechanic, I cannot make that evaluation. Unfortunately, the Appleton vehicle may not be available for inspection, and a forensic analysis of the interior damage to that vehicle would provide a great deal of information as to whether there was a substantial front-end component to the collision.

We have collected and reviewed the medical records provided by the plaintiffs. The plaintiffs current complaints seem to be inconsistent with the injuries sustained in the accident. We can evaluate the alleged injuries and damages based on our review of the medical records, but I recommend that we retain experts to evaluate the plaintiffs alleged dame claims. We will recommendations as to proposed medical experts as well as a vocational rehabilitation expert, a life care planner and an economist.

We can have a preliminary case evaluation before the Christmas holidays. However, that evaluation will be subject to revision depending on the expert review and analysis of the case.

On December 7, 2016, defense counsel proposed certain experts to Ms. Washor, including Dr. Charles DiCecca, an orthopedic surgeon, and Leslie Schumacher, a life care planner. Washor authorized defense counsel to hire a medical expert and life care planner. On December 16, 2016, defense counsel confirmed a mediation with Brian Mone from Commonwealth Mediation and Conciliation which was scheduled for March 24, 2017.

On December 9, 2016, defense counsel filed a petition in the Worcester Superior Court pursuant to Mass. R. Civ. P. 27 seeking "an Order authorizing Curtiss-Wright to take the depositions of, and issue subpoenas duces tecum to, Countryside Motors & Towing ("Countryside"), Commerce Insurance Co., Safety Insurance Co., JD Raymond Transport, Inc. ("JD Raymond"), and Jason Appleton. Depositions of these entities and individuals are necessary to determine the location of the vehicles involved in a motor vehicle accident that occurred on

January 29, 2015 in order to preserve the vehicles as evidence for anticipated litigation involving two injured parties, Jason Appleton and Paula Sweet."

Defense counsel updated Ms. Washor concerning his impressions of the case on January 30, 2017. He wrote that "[t]he plaintiff's damage claims seem very inflated. We have engaged experts to address those claims and we expect substantially lower damage figures from our experts. Unfortunately, the experts have not gotten back to us with their evaluations despite repeated contacts from us."

Leading up to the March Mediation, on February 3, 2017, Plaintiff's counsel filed suit in the Worcester Superior Court. On February 20, 2017, Ms. Washor established a $4 million gross reserve through a Major Loss Report. In terms of the Next Steps, the MLR reflects:

> *Confirm liens. Complete accident reconstruction review regarding whether Appleton vehicle struck truck first before being struck by Breault's vehicle. Pursue contribution from Breault's personal lines carrier. Attempt to resolve pre-suit through Alternative Dispute Resolution. Pursue recoupment of defense expenses from Travelers, which obtained only a partial release and abandoned its defense obligation.*

By March 13, 2017, defense counsel advised Ms. Washor that there was no liability defense to the case and that it was only defensible on damages.

On March 14, 2017, defense counsel sent Ms. Washor a copy of the Defendants' Confidential Mediation Memorandum. Counsel wrote in the cover e-mail that "[y]ou'll note that our life care planner revised her opinion regarding Ms. Sweet's future home care needs, which she believes will be required six hours per day. Our economist calculates that the present value of the lifetime cost of that care is just under $900,000."

At the Mediation, Christina Macissaac, a Senior Complex Director at AIG Claims, presented the AIG Claims offer of $2 million to settle Plaintiff's claim. Plaintiff's counsel asked to suspend the mediation in order to provide AIG Claims with additional medical supports for her claimed injuries and damages. Plaintiff's last demand was $17 million at this stage.

Following the mediation, Ms. Washor wrote: "the mediation was a joke and their expectations are ridiculous so if they are holding to those ideals, there may not be any reason to negotiate further…." Ms. Washor further noted that she needed to "await Plaintiffs' medical report updates before counsel can advise which expert doctors to hire to combat plaintiffs' exaggerated claims."

<u>Events Prior to the October 2017 Second Mediation</u>

On May 9, 2017, Jim Campbell wrote to Ms. Washor concerning the retention of experts:

*Nicole, we have not identified or retained any additional experts at this time. Both plaintiffs indicated that they are seeking additional medical expert support for their claims. I think we need to know what the medical claims are before we retain experts. For instance, Ms. Sweet's lawyers claimed that she has incontinence issues as the result of a bladder injury. We do not have any medical records or expert reports supporting that claim. We cannot retain an expert on that issue without knowing what the alleged injury is and how it supposedly relates to the accident. Similarly, Mr. Appleton's alleged brain injury is not well defined or supported by the medical records. We need understand the scope and basis of the claim before we can retain experts. The same can be said for other aspects of the plaintiffs' medical claims.*

*If we retain medical experts now, I don't think we will get much to assist with the defense of the case since the plaintiffs' claims are not well defined.*

The parties agreed to continue to mediate with Brian Mone on October 3, 2017. In August 2017, defense counsel wrote to the Plaintiff's attorneys about additional medical records ahead of the October mediation. On September 28, 2017, defense counsel reported on the results of surveillance performed on Plaintiff. He wrote to Ms. Washor that "[t]hese videos substantially contradict the narrative presented by Jason Appleton as incapable of caring for himself independently. With respect to Ms. Sweet, the brief clip we have does show her use of a wheelchair, but it also shows that the physical limitations presented in the 'Day in the Life' video were dramatically overemphasized." The email from defense counsel continues to state, "The only clip the investigator was able to get of Paula Sweet is showing her being helped out of their SUV and

into a wheelchair to be taken into a rehab facility (video dated 9/26/2017). The video shows her using Mr. Appleton to some extent, but then taking one or two steps under her own power and then sitting in the wheelchair without noticeable discomfort."

On September 29, 2017, Plaintiff's counsel sent defense counsel a report from a urologist, Dr. Grocela. The following day defense counsel wrote Ms. Washor:

> Yesterday afternoon I received the attached expert report from Dr. Joseph Grocela, a urologist at Massachusetts General Hospital, regarding Paula Sweet. The attachment also includes an operative report and office visit report relating to Ms. Sweet's issues with incontinence.

> At the mediation in March Ms. Sweet's counsel highlighted her issues with incontinence despite there being no medical records to corroborate these reports. We have been requesting medical records to support Ms. Sweet's claims since the mediation in March, and these are the first records we have received. I spoke with Ms. Sweet's counsel yesterday afternoon, and he indicated there are no other updated records he will be able to provide by Tuesday.

Ms. Washor and defense counsel attended the mediation on October 3, 2017 with Brian Mone. At the mediation, AIG Claims increased its settlement offer from $2 million to $2.65 million. The parties reached an impasse based upon counsel's dissatisfaction with the settlement offers made by AIG Claims; Plaintiff's demand at this stage was $16 million. Following mediation, Ms. Washor reported to her superiors that the case did not settle at mediation, stating: "the plaintiffs are holding us for ransom."

Events Prior to the December 2018 Third Mediation

Following the conclusion of the second mediation, Ms. Washor set out to reevaluate the claim and the existing reserves. On October 13, 2017, Washor asked defense counsel to perform verdict research. On October 17, 2017, defense counsel provided an estimated verdict range for Plaintiff's claim between "$6.5-$8.5 million." Ms. Washor created a "Tech Review Outline" and slide presentation to several senior casualty claim professionals with AIG Claims as part of an

internal tech review that occurred on October 27, 2017. The results of the tech review reflected an average value of Plaintiff's claim of $4.9 million. Following the tech review, Ms. Washor prepared a second MLR to post a reserve of $7.5 million for the Appleton and Plaintiff claims. Ms. Washor's managers approved the second MLR on November 1, 2017.

AIG Claims then hired Magna, an outside vendor, to conduct a "Jury Verdict Evaluator" in early November 2017. This involved a mini mock trial conducted online and computer simulations using results obtained to simulate the results of 500 juries. The process took about 4 weeks from initiation. The Jury Evaluator came up the following average results for the Plaintiff: Economic: $3,380,077; Non-Economic $4,149,216; Total $7,529,293.00.

Ms. Macisaac assumed full responsibility for Plaintiff's claim from Ms. Washor in July 2018. In the underlying liability case, the Superior Court established a scheduling order that included a deadline for fact discovery and regimen for expert disclosure.

On October 1, 2018, defense counsel arranged for Plaintiff to undergo an impartial medical examination in accordance with Mass. R. Civ. P. 35 with Dr. John Corsetti. Defense counsel deposed Plaintiff over the course of two dates: October 24, 2018, and November 6, 2018. At her deposition, Plaintiff testified that: prior to the accident she had 15 miscarriages and two ectopic pregnancies; she could have sexual intercourse with her husband; and before the accident she was taking Xanax, Valium, Perphenazine, Lamictal and Adderall for panic attacks, seizures and bipolar disorder.

To follow up on these claims, the day after the November deposition defense counsel requested approval to retain Dr. Anthony DiSciullo as a gynecology expert to address Plaintiff's claim that she is not able to conceive or carry a child to term because of the injuries she sustained in the accident. Ms. Macissaac approved this request. Defense counsel also requested approval to

retain a neurologist, Dr. Michael Hutchinson to assess Plaintiff's claim that she is having seizures related to the accident. This request was also approved by Ms. Macissaac.

On November 27, 2018, Ms. Macissac documented that she received correspondence from defense counsel, Jake Lantry, regarding defense urologist, Dr. Art Mourtzinos:

- Dr. Mourtzinos will opine that Sweet's bladder perforation injury has not resulted in any voiding issues or decrease in sensation;

- He will further opine that there is no evidence that Sweet suffers from stress incontinence (i.e. leakage as a result of muscle weakness);

- He will, however, opine that Sweet does have "overflow incontinence" meaning that she lacks the sensation that she needs to urinate and therefore her bladder will fill up without her knowing and This occurred because of an injury to her S3 nerve in the accident. He opines this issue can be addressed by Sweet catheterizing herself four times daily; and

- Dr. Mourtzinos will further opine that the anti-depressant medication Sweet is taking and had been taking long before this accident is known to cause decreased bladder contractibility and is contributing to her incontinence issues.

On November 30, 2018, the parties made their expert disclosures for the trial in Superior Court. On December 17 and 18, 2018, the parties participated in a third mediation, this time with Paul Finn. Ms. Macisaac and defense counsel participated in the mediation. At the mediation, AIG claims increased the settlement offer to $3.25 million. During the negotiations, plaintiff reduced her demand to $15.5 million. The parties could not continue the mediation due to disparate settlement expectations.

<u>Trial and Judgment in the Underlying Case</u>

On January 4, 2019, Defendant served an offer of judgment by first class mail to Plaintiff for $5 million. Before doing so, Ms. Macisaac spoke to the insured's Vice President, General Counsel and Corporate Secretary, Paul Ferdenzi, regarding defense counsel's intent to serve offers of judgment, and documented in the file notes that he concurred with this strategy.

On January 3, 2019, Plaintiff served a demand seeking relief under c. 93A. In this letter, she demanded the sum of $17.5 million to settle her claims; an increase of $2 million from her last demand at mediation. AIG Claims responded to this letter renewing its settlement offer of $5 million, denying Plaintiff's allegations of unfair insurance claim settlement practices, and offering the additional sum of $25.00 with regards to her 93A allegations. Plaintiff did not accept the $5 million settlement offer.

On January 30, 2019, defense counsel furnished AIG Claims with a Pre-Trial Report.  With respect to Plaintiff's counsel, defense counsel wrote, in part:

> Mr. O'Brien is an experienced plaintiff's attorney. Ms. Bagdis has much less experience, and we expect her to play a large role at trial. It is clear from our conversations with her and representations from mediators that she is overly confident about all aspects of Ms. Sweet's alleged damages (most notably her belief that the accident has precluded Ms. Sweet from being able to conceive or bear another child, despite the fact that Ms. Sweet had 13 pre-accident miscarriages and no expert has opined that she is unable to conceive or bear a child).

Plaintiff's expert economist opined that present day value of past loss of earnings and future diminution in earning capacity was between $294,445 and $994,496.  Plaintiff disclosed the following expert(s) ahead of the trial:

> Dr. William Burke (life care planner) – Dr. Burke will testify regarding the life care plan he prepared for Ms. Sweet.  He will testify that Ms. Sweet's future medical care needs total $4,383,589.

> Dr. David Schap (economist) – Dr. Schap will testify based on hypothetical employment scenarios presented to him by Ms. Sweet's counsel.  He will testify that if Ms. Sweet were to be employed as a part-time PCA with no fringe benefits, then her lost earning capacity would total $306,509.  He will further testify that if Ms. Sweet were to be employed as a part-time nurse with benefits, her lost earning capacity would total $995,158.

> Dr. Ronald Goldberg (plaintiff's primary care physician) – Dr. Goldberg would testify regarding his pre- and post-accident treatment of Ms. Sweet.  We will move to preclude Dr. Goldberg from testifying as an expert, as he simply is a treating physician and therefore should be disclosed as a fact witness.

Dr. Joseph Grocela (urologist) – Dr. Grocela will testify that as a result of the accident Ms. Sweet now suffers from stress incontinence (an inability to hold her urine).  He will testify that he estimates her whole body impairment, as a result of her incontinence, to be between 40% and 50%.

Dr. Roberto Feliz (pain specialist) – Dr. Feliz will testify that Ms. Sweet's continued pain is a direct result of the motor vehicle accident.  He will further testify that the lumbar facet injections Ms. Sweet has been receiving for pain will become less and less effective with each treatment.

Dr. Thomas Halpin (gynecologist) – Dr. Halpin would testify that despite Ms. Sweet's injuries, she could carry a pregnancy to viability now.  He would further testify, however, that the injuries sustained by Ms. Sweet have made her incapable of independently caring for a child.  We have moved to preclude Dr. Halpin's testimony because he does not seek to offer a gynecological opinion.

Defense counsel disclosed the following expert(s) ahead of the trial:

Dr. Michael Hutchinson (neurologist) – Dr. Hutchinson will testify that the seizures Ms. Sweet alleges to suffer began prior to this motor vehicle accident.  He will testify that her seizures are not neurological, but rather psychiatric "pseudoseizures" that are unrelated to the accident.

Dr. John Corsetti (orthopedic surgeon) – Dr. Corsetti will testify that Ms. Sweet has reached maximum medical improvement with respect to all of her orthopedic injuries and that she will not need additional surgeries.  He will concede that Ms. Sweet will likely remain in some pain for the remainder of her life.

Kerry Skillin (vocational rehabilitation expert) – Ms. Skillin will testify that Ms. Sweet would not have maintained consistent employment even if this accident had not happened.  She will testify that based on Ms. Sweet's spotty work history and longstanding psychiatric diagnoses, she could not be considered a candidate for consistent employment.

Dr. Samuel Lundstrom (economist) - Dr. Lundstrom will testify that the appropriate present value of the plaintiff's life care plan is $2,479,781 and that the present value of the life care plan prepared by Leslie Schumacher on behalf of the defendants is $1,505,790.

Dr. Henry Miller (health care costs expert) - Dr. Miller will testify that the reasonable value of the plaintiff's past medical expenses is $250,655.  He will further testify as to the reasonable value of the items identified in the plaintiff's life care plan.

Leslie Schumacher (life care planner) - Ms. Schumacher will testify regarding the life care plan she created with respect to Ms. Sweet.  She will testify that the cost of Ms. Sweet's future care needs is $2,674,689 (which will be discounted to present value by Dr. Lundstrom).

Dr. Art Mourtzinos (urologist) – Dr. Mourtzinos will testify that Ms. Sweet does not have stress incontinence, but that she does have "overflow incontinence" due to S3 nerve damage.  He will testify that this can be addressed with constant bladder emptying and 4–5 times daily catheterization.

Dr. Anthony DiSciullo (gynecologist) – Dr. DiSciullo will testify that Ms. Sweet did not sustain an injury in the accident that would preclude her from being able to conceive and bear a child if she were able.  He will testify that she did not sustain injuries to any of her reproductive organs but that she possibly would have to deliver the child via c-section given her pelvic fracture.

Dr. Bernard Katz (psychiatrist) – Dr. Katz will testify that Ms. Sweet's psychiatric condition has not materially worsened since the accident.  He will testify based on his review of Ms. Sweet's pre- and post-accident psychiatric records that Ms. Sweet continues to experience psychiatric symptoms that she has had for years prior to the motor vehicle accident.

Leading up to trial, Ms. Macisaac continued her efforts to settle the case. On March 10, 2019, she wrote to plaintiff's counsel to propose parameters for a high-low agreement. At that point Plaintiff's last formal demand $17.5 million. Ms. Macisaac and Plaintiff's counsel attempted to negotiate a mutually acceptable high-low agreement. AIG Claims offered a dollar range of $6.5 million to $14 million. Plaintiff's attorneys rejected all high-low proposals that (1) provided for an offset for the $600,000 in funds received from other settlements; and (2) did not allow for the addition of pre-judgment interest. Plaintiff testified that she remembers discussing high-low agreements but chose not to accept the proposals. Plaintiff never offered to settle her claim for less than $10 million.

The trial began on March 11, 2019, and ended on March 26, 2019. On March 27, 2019, the jury returned a verdict for Plaintiff and awarded her damages for (1) past medical expenses in the amount of $655,000.00; (2) future medical expenses in the amount of $3.2 million; (3) lost

earnings in the amount of $210,000.00, past pain and suffering in the amount of $1.5 million, and future pain and suffering in the amount of $1.9 million, for a total verdict of $7.465 million. The clerk added pre-judgment interest in the amount of $1,920,580.27 and entered a judgment. An amended judgment entered on April 12, 2019, which deducted the $600,000 for the prior settlements Plaintiff received before trial. On April 16, 2019, National Union issued a check in the amount of $6,865,000.00, in satisfaction of the damages awarded the Plaintiff. It also issued a check in the amount of $1,827,541.49 for accrued interest, satisfying the judgment.

Present Lawsuit

On April 19, 2021, Plaintiff, through new counsel, sent a letter to Peter Zaffino, Chief Executive Officer & President of American International Group, Inc. and Brian Duperreault, Chief Executive Chairman of American International Group, Inc., supplementing the G.L. c. 93A demand sent on January 3, 2019.  In this supplemental demand letter, Plaintiff's counsel claimed that "[a]s a result of AIG's unfair and deceptive acts and practices, Mrs. Appleton has suffered actual damages including but not limited to the loss of use of the monies to which she was entitled, *i.e.*, loss of use of judgment from October 3, 2017 to the date it was paid and severe emotional distress, which we value at $1 million." On June 18, 2021, the AIG Defendants responded to the demand letter. Plaintiff's counsel sent an amended, supplemental c. 93A demand letter to AIG Claims and National Union on July 2, 2021. The AIG Defendants responded to this letter on July 30, 2021.

Plaintiff commenced this suit on August 2, 2021. In her Complaint, Plaintiff claims damages for the AIG Defendants' alleged "willful and knowing" unfair insurance claim settlement practices that violated G.L. c. 93A. Specifically, she alleges that in October 2017, the defendants unfairly and in bad faith, failed to make a reasonable offer of settlement when liability and

damages were reasonably clear in violation of G.L. c. 176D and a knowing and willful violation of G.L. c. 93A. Plaintiff claims that thereafter, over the course of the litigation and through trial, the defendants unfairly and in bad faith, failed to make a reasonable offer of settlement in violation of G.L. c. 176D, which was also a knowing and willful violation of G.L. c. 93A. She alleges that if the AIG Defendants had made a "fair and reasonable" offer of settlement, she would have accepted the offer.

When asked to state the basis for her claim that the AIG Defendants failed to conduct a reasonable investigation based on all available information, plaintiff answered:

> I am not an attorney or an expert, however, I am informed that defendant was informed of the crash around January or February of 2015. My attorney sent a demand letter in August 2016, outlining their liability as well as my injuries, all supported with the State Police Reconstruction Report; photographs of the roadway; photographs of the crash; medical records; medical bills; expert reports; and a video made of my daily struggle over a year after the crash.
>
> Despite the clear liability (my husband and I were struck from behind by a vehicle going 60 mph which did not even attempt to stop before careening into us) and damage, it appears that defendant's first expert report was not obtained until sometime in 2018. This was over three years after the initial crash, over two years after the initial demand, over a year after defendant's first offer, and approximately a year after the second attempt to mediate the matter.

Plaintiff contends that AIG Claims should have made her a settlement offer in the amount of the judgment.  On the first day of her deposition in the 93A case, Plaintiff testified that she thought the jury's award was fair. On the third day of her deposition, Plaintiff expressed the opinion that the jury's verdict was too low and did not fairly compensate er for her damages.

II.    Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Carroll v. Xerox Corp., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.'" Sensing v. Outback Steakhouse of Florida, LLC, 575 F.3d 145, 152 (1st Cir. 2009) (quoting Calero-Cerezo v. U.S. Dep't. of Justice, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the non-moving party and makes all reasonable inferences in favor thereof. Sensing, 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. Id., at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" Id. (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." Id. (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences." Id. (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."'" Sensing, 575 F.3d at 152. (citation to quoted case omitted).

III.   Discussion

Mass. Gen. L. c. 176D/93A

"General Laws c. 93A § 2(a) states that '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.' General Laws c. 176D, § 3, in turn, prohibits 'unfair or deceptive acts or practices in

the business of insurance[.]'" Bobick v. U.S. Fid. & Guar. Co., 439 Mass. 652, 658 (2003).

Because Chapter 93A incorporates Chapter 176D, an insurer who violates the latter statute "by

definition, has violated the prohibition in [Chapter] 93A § 2, against the commission of unfair or

deceptive acts or practices." Id. at 659 (quoting Hopkins v. Liberty Mut. Ins. Co., 434 Mass.

556, 564 (2001)). The purpose of the statutory scheme is to "encourage the settlement of

insurance claims ... and discourage insurers from forcing claimants into unnecessary litigation to

obtain relief." Clegg v. Butler, 424 Mass. 413, 419 (1997) (internal citation omitted). As in this

case, a consumer asserting a section nine claim "may recover for violations of G.L. c. 176D, § 3,

c. 9, without regard to whether the violation was unlawful under G.L. c. 93A, § 2." Polaroid

Corp. v. Travelers Indem. Co., 414 Mass. 747, 754 (Mass. 1993). "To be held unfair and deceptive

under c. 93A, practices involving even worldly-wise businesspeople do not have to attain the

antiheroic proportions of immoral, unethical, oppressive or unscrupulous conduct, but need only

be within any recognized or established common law or statutory concept of unfairness."

VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 620 (1994).

M.G.L. Ch 176D § 3(9)(d) defines an "unfair claims settlement practice" to include

"refusing to pay claims without conducting a reasonable investigation based upon all available

information." In other words, insurers must investigate claims thoroughly before making a

determination of an insurer's liability. Clegg v. Butler, 424 Mass. at 421 (where an insurer fails

to interview parties and persons with knowledge of the facts and otherwise performs an

inadequate investigation, the insurer violates General Laws Ch 176D § 3(9)(c) and 3(9)(d)).

176D § 3(9)(d): Failure to Conduct Reasonable Investigation

Section 3(9)(d) of Chapter 176D bars insurers from "[r]efusing to pay claims without

conducting a reasonable investigation based upon all available information." "[R]ecovery on a

theory of inadequate investigation is limited to circumstances where, if an adequate

investigation had been conducted, liability would have been reasonably clear." Spinal Imaging,
Inc. v. Aetna Health Mgmt. LLC, No. CIV. 09-11873-LTS, 2014 WL 4202498, at *14 (D.Mass.
Aug. 21, 2014) (citing Behn v. Legion Ins. Co., 173 F.Supp.2d 105, 113 (D.Mass. 2001)). "In
order to determine whether liability is 'reasonably clear,' the fact finder must determine
'whether a reasonable person, with knowledge of the relevant facts and law, would probably
have concluded, for good reason, that the insurer was liable to the plaintiff.'" Nyer v. Winterthur
Int'l, 290 F.3d 456, 461 (1st Cir. 2002) (quoting Demeo v. State Farm Mut. Auto. Ins. Co., 38
Mass.App.Ct. 955, 649 N.E.2d 803, 804 (1995)). Relevant facts include, "insurance industry
practices in similar circumstances, expert testimony that the insurer violated sound claims
practices, the defendant's own evaluation of the plaintiff's claim, and advice given to the
insurance company on the probability of success at trial." O'Leary-Alison v. Metropolitan
Property & Cas. Ins. Co., 52 Mass. App. Ct. 214, 752 N.E.2d 795, 798 n.3 (2001).

Defendants move for summary judgment with respect to Plaintiff's claim that Defendants
engaged in unfair claim settlement practices by failing to conduct a reasonable investigation.
Plaintiff argues generally that Defendants disregarded its duty to conduct a reasonable
investigation of Plaintiff's claims prior to each of the parties' mediations and prior to trial.
Defendants contend that it is entitled to summary judgment on this claim because Plaintiff has
failed to present any evidence to show that its investigation was inadequate or that it failed to
offer a settlement when liability was reasonably clear.

The undisputed facts establish that Defendants opened an investigation into Plaintiff's
claim within weeks of receiving its first notice of the incident in November 2015. The claims
notes" began soon after on December 1, 2015. The facts also demonstrate that Defendants
continued to investigate Plaintiff's claims and monitor the factual and legal developments
throughout the course of the underlying action. In particular, the record demonstrates that

Defendants maintained communications with Plaintiff's counsel regarding developments in the litigation and assessments of potential liability, reviewed information concerning the Plaintiff's alleged injuries, performed its own evaluations regarding the value of the case, and monitored events during the trial. These facts compel the conclusion that Defendants conducted a reasonable investigation. See Cytosol Labs, Inc. v. Fed. Ins. Co., 536 F. Supp. 2d 80, 95 (D.Mass. 2008) (listing proactive steps taken by insurer to investigate plaintiff's claim as evidence of insurer's reasonable investigation and ruling that plaintiff's Chapter 93A claim was "insufficient as a matter of law" where plaintiff failed to show "that a reasonable insurer would have conducted any additional investigation."). Plaintiff has failed to "specify any concrete investigatory steps that [Defendants] did not take or lines of inquiry that went unpursued[.]" Scott v. Vt. Mut. Ins. Co., 2011 WL 4436984, at *13 (D.Mass. Sept. 22, 2011). Here, Defendants' investigation went beyond simply "reviewing the materials submitted with [the] claim." Federal Ins. Co. v. HPSC, Inc., 480 F.3d 26, 35-36 (1st Cir. 2007). Accordingly, Defendants is entitled to summary judgment with respect to 176D § 3(9)(d).

      176D § 3(9)(f): Failure to Settle when Liability has become Reasonably Clear

      Section 3(9)(f) of Chapter 176D requires insurers to "effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Under Massachusetts law, "[a]n insurer's duty to settle does not arise until 'liablility has become reasonably clear.'" Scott, 2011 WL 4436984, at *8 (quoting Mass. Gen. L. c. 176D, § 3(9)(f)). "Liability" for purposes of this requirement "encompasses both fault and damages." River Farm Realty Tr. v. Farm Family Cas. Ins. Co., 943 F.3d 27, 38 (1st Cir. 2019) (quoting Clegg v. Butler, 424 Mass. at 421). Therefore, "liability cannot be considered 'reasonably clear' if either fault or damages are still contested." Clegg, 424 Mass. at 418, 676 N.E.2d at 1138. See also Bobick, 439 Mass. at 659-60, (ruling that the insurer "[is] not required to put a fair and reasonable offer on the table until

liability and damages [are] apparent" or if "there exist[s] a legitimate difference of opinion as to the extent of ... liability."). "[E]ven if an insurer has concluded that fault has attached, doubt as to either damages or the proportionate share of damages may prevent liability from being reasonably clear." Scott, 2011 WL 4436984, at *8. In the instant case, "[t]he relevant inquiry is whether [Defendants] reasonably believed that its insured's liability with respect to damages was not clear." O'Leary-Alison v. Metro. Prop. & Cas. Ins. Co., 52 Mass. App. Ct. 214, 217, 752 N.E.2d 795, 798 (2001).

The determination as to when liability is reasonably clear depends on when "a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." Nyer v. Winterthur Int'l, 290 F.3d 456, 461 (1st Cir.2002) (quoting Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass. App. Ct. 955, 649 N.E.2d 803, 804 (1995)). In instances where, like here, fault is not at issue, "the inquiry is limited to damages." O'Leary-Alison, 52 Mass. App. Ct. at 217. "This is an objective standard, which takes into account the totality of the circumstances." Scott, 2011 WL 4436984, at *8 (internal citation omitted). Relevant evidence may include, but is not limited to, "insurance industry practices in similar circumstances, expert testimony ..., the defendant's own evaluation of the plaintiff's claim, and advice given to the insurance company on the probability of success at trial." O'Leary-Alison, 52 Mass. App. Ct. at 217 n. 3, 752 N.E.2d at 798 n. 3.

The undisputed facts on the record establish that the parties to the underlying action continued to engage in the development of expert testimony regarding their opposing positions with respect to Plaintiff's injuries and Defendants' liability with respect to damages. Further, no reasonable factfinder could conclude that liability was reasonably clear at the time of trial because, at a minimum, the issue of Plaintiff's damages remained highly contested and significantly disparate. Clegg, 424 Mass. at 418. Between three attempts at mediation,

Defendants increased its settlement offers and re-evaluated the claim. The evaluative process continued with a verdict range, tech review, and a jury evaluator by Defendants informed its offers and negotiations with the Plaintiff. Where multiple reasons support an insurer's evaluation of a conduct during settlement, there is no violation of c. 93A or 176D. See Bobick, 4439 Mass. at 659. Accordingly, Plaintiff cannot establish that Defendants were unreasonable or failed to act in good faith.

IV.     Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment (Docket No. 34) is ***granted*** as to all counts.


SO ORDERED.
Dated: September 30, 2024

/s/ *Margaret R. Guzman*
MARGARET R. GUZMAN
UNITED STATES DISTRICT JUDGE